You can call the next case. Thank you. 17-2056, Marianne Guzall, also known as Marianna Guzall v. City of Romulus, MI, Alan R. Lankford v. C. Krampus. The oral argument is as follows. 15 minutes for the plaintiff. 15 minutes to be heard by the defendant. Mr. Kugin for the plaintiff's appellate. Thank you. May it please the Court Attorney Lawrence Kugin representing the appellate, Marianne Guzall, when I reserve five minutes for rebuttal, please. Now this is a case where my client's admission, admissions by defendants here, show material issues of fact. My client was an employee of the mayor's office for the City of Romulus for a number of years and just a few months away from vesting in her pension. An investigation was ensued by the Michigan State Police to investigate some misgivings going on within the mayor's office. My client was let go because she refused to talk too much, was what Mr. Defendant Lambert reported to a Mrs. Williams, and obviously that would be admissible under 801. It's not hearsay. Statements by a defendant is not hearsay. The trial court ruled that that, in fact, was hearsay and not admissible. Mr. Lambert was complaining that my client had talked to Mayor Pro Tem and informed him of all the illegal activities going on in the mayor's office, such as cash payments, illegal campaign contributions. I'm getting confused. Okay, your client, when was this statement from, Williams said that Lambert said these things about your client. Correct. And when did he supposedly say them? Within several months of my client being discharged. So just prior to my client being discharged. The pretext in which the mayor indicated to my client that she was letting go because of the fact that there was a millage and the millage didn't go through, these statements were made prior to the millage even being voted upon that he was going to get rid of her because she talked too much. And it's clearly not hearsay. She informed him about the campaign finance reports. In essence, there was $15,700 of cash that was not accounted for in the mayor's campaign finance report. The mayor was taking money from individuals. Mr. Bozzi reported that he was to pay the mayor $125,000 for his getting the permission to open up his new business. And she reported this to someone? She reported all this to the mayor of Pro Tem who she thought would, in fact, take action on it. And, in fact, he went to the mayor and reported everything, and it was used as a basis to hold for my client her continued employment. And this happened when? Just prior to her discharge. Can you tell me a date? It was 2010. I don't know. I don't have the exact date in front of me. But it happened just before she was terminated. All this information. Okay. Maybe when you come back for rebuttal you can tell me the date. All right. Exactly. But in addition to that, this was a common scheme and practice and motive of the department. The mayor would go campaigning, go door to door, and individuals who refused to put up a sign, within days their homes would be raided. And it was testified by a number of police officers that if they didn't pay money to the campaign of the mayor, their job was threatened, and, in fact, they would be terminated. So even if it's not admissible as a non-hearsay, it would be admissible under 8033 for common scheme, practice, motive, and intent. The trial court did not allow any of this testimony to come in claiming it was all hearsay. And so that's where I indicate the problem is. Mr. Bazzi indicated that on at least two other occasions he received $3,500 cash payment and was taken directly to the mayor. In addition to that, the mayor instructed Mr. Bazzi, who said during his investigation, that he is to pay the mayor $2,000 a month. But what does this have to do with why she was let go? She was let go because of her protected free speech, and that's why she was terminated, because she was reporting the illegal activity. And she was told if she didn't lie to the state police investigation, she would be let go or terminated. Was there a countywide layoff? Not a county, a citywide layoff? There were some layoffs, but her job was protected under the charter, and she was informed of that by both crampets as well as the city finance administrator and the human resource division. Her position was protected by charter. She was told that and reported that she would not be let go because of the charter. And in fact, Mayor Lambert admitted during his deposition that it was a mistake of him to let her go. It says she was laid off, but the records reflect that in fact she was not laid off, she was in fact terminated. So there's a difference between being laid off and being terminated. And do you know who made that decision? Presumptively, the mayor made the decision to let her go. He informed Mrs. Williams that he was letting her go because she talked too much. Well, at the time that she was discharged, who purported to make that decision? Crampets and Motovic, the agent of the employer. I'm sorry, Crampets and who else? Well, Jatovic is her name. She is also in the office of the mayor as well. Okay, and they made the decision? Mayor as well as Crampets made the decision to terminate her. She was informed she would be terminated. And again, this is past practice that goes on. Officers Laddick, officers Droege also indicated that the mayor and the city administration retaliates against people for basically informing the government officials, other government officials, police investigations, the legal activity taking place within the city. So what's the evidence that you point to to support this assertion of established past practices of terminating people who talk too much? Well, Cynthia Lyons' job was threatened by the mayor if she did not push through Mo Basi's business, which basically the mayor is receiving kickbacks for. There were other employees as well. St. Andre, the former police chief, indicated that he was to call the mayor prior to a local topless bar being raided so the mayor could alert the owner. And in fact, the mayor received $10,000 in cash when my client witnessed the payment from the Suby's topless bar to the mayor's office. It came in the form of cash. So these are people who were, in your assertion, similarly situated to Ms. Gasol in terms of their treatment? Correct. It basically was a concern when public officials act with the intent to deter the free rights of individuals, Your Honor. So there was a number of people, Mr. Basi, Cynthia Lyons, as well as several other police officers, all retaliated against as a result of coming forward with illegal conduct, which was motivated by the greed and habitual custom of routine practice engaged of the Romulus officials. And my client was approached by Wachovic as well as Krampus and indicated she would be terminated when she told them she would not lie to a Michigan State police investigation. She received her pink slip. I realize there's a lot you want to go through. There is a lot. But can you, you've alleged an intentional infliction of emotional distress claim. And I would like you to just sort of focus narrowly on the conduct that would establish that claim because that's a high bar. Well, when she's forced to choose between lying to keep her job, her choice would be to lie in order to keep her job and her pink slip was hauled over her head if she wouldn't lie. And that in and of itself caused emotional stress. When a person has to pick between lying to a police investigation and keeping their job, that is in itself emotional distress. I thought the investigation was after she was. Well, it was ongoing even prior to that. There was a number of individuals who were indicted. There was never one? There was a number of other individuals. It was an ongoing investigation. And other members of the mayor's office had already testified and came forth and told my client they in fact lied and they expected her to do the same. And she said she simply would not. In addition, I'd like to focus on discovery. I was present during a phone call that was made between the court and the defendants and the defendants requested that my client produce her husband's law office phone. We objected on the basis that it was privileged information contained on the phone, my client's clients, the e-mails and text messages. And the court ruled without defendants ever filing a motion that the plaintiff's husband's law office phone would be turned over for forensic evaluation. At that same phone conference, I requested that the court allow me to have the defendants' phones and their employees' phones to do a forensic evaluation of them to observe. I thought there was a tape, right, that he played at a deposition. It was a tape. Okay. And so that's why he was ordered to hand over the phone. Well, that tape was already provided. The transcript of that phone tape was already provided to the court and to the defendants prior to that. But the defendants went further and requested a forensic evaluation of my client's husband's law office phone, which she used, and was granted. We, in turn, request the same relief. They never filed a motion requesting it. It was done. Right. But what was your reason for it? Obviously, the parties were acting in concert and communicating with one another about determination of my client and other illegal activities, and that would have been made available for us to use for discovery. If they're going to allow them to use my client's phone, my client's husband's law office's phone, why would the defendant be not allowed to use or look at the phones of the defendants? Because there was a reason for that one. I mean, you should have, I could see asking for the examination to be narrowed to that, you know, that tape, but. . . Well, the court ordered already. It was moot at that point. They had already examined the phone. We requested that we be afforded the same opportunity, and that was denied. So I see my time's up at this point. Okay. Thank you. You still have your rebuttal. Thank you. Good morning, Your Honors. Megan Kavanaugh, appearing on behalf of Alan Lambert. We're going to be splitting our time between the three of us. I just wanted to, obviously, this is very thoroughly briefed, and it's all in the briefs. I did just want to address a couple of the issues, and I think the questions, Judge White, that you pointed to are the very questions that the district court had in this of saying when, you know, plaintiff needs, it's her burden to prove that this, that there is some causal connection. And so the, you know, when did the Williams statement occur, or allegedly her Lambert statement to Williams? If you look at the affidavit, it doesn't say when these statements were allegedly made from Lambert to Williams. It said shortly before her employment was terminated. Okay. Well, that gives you some. But what do you do about that? I mean, he's saying, and we know that there's, this is not out of whole cloth. I mean, there's some substance here about activities that maybe you wouldn't want people to know about. So if you have him saying that, you know, she talks too much and we need to get rid of her. Well, and I think it matters. I mean, if you look at the affidavit, and I think that that's what the district court did. I mean, even assuming it's an admission, which it's conclusive, she had to be let go. That's unremarkable. I mean, we knew this. And the record establishes, you know, the task force was created. There was 28 full-time employees laid off, not including plaintiff. How was she chosen? Two millages. Two millages. The record established, the record evidence, and I know that this was noted by the district court, is that it was made collectively by all of the, by a team of persons representing the various departments. So I think even giving, going so far as to- Is it in the record who represented this department? No. There is a plaintiff testified that there was a meeting, she believed, that included Lambert, Krampets, and others. And she, but she can't identify or it doesn't have any evidence that this was, in fact, when this decision was made or who that was made. But even assuming that these individuals, the individual defendants, were part of that decision, part of this collective, there's no, there's no dispute that there were others in that meeting that have no relation to any sort of retaliatory motive. Right, but I mean, it's reasonable that you come together and each department says, okay, we'll give up this person. You know, that's- Sure. Well, I mean, but if you look again, I mean, the timing, the sort of squishy timing of, well, three months before or, you know, maybe it was sometime before the millage. Well, which millage? When was this meeting had? When was it done? I mean, but what the record shows is that, you know, there's a round of layoffs in August of 10. This, I won't lie to the police, happens in May of 2010, supposedly. She doesn't get included in the first round of layoffs, which happened a couple months after that. She doesn't get laid off until May or March of 11, almost a year later. And then she doesn't even talk to the Michigan State Police until over a year, until a year after her being laid off. To say that this, I'm going to tell the police the truth, doesn't- Was there an investigation going on this whole time? There was an investigation, I believe, initially started in 2009 into the police department. It was sometime in 2010 when there was an investigation opened into Mayor, at the time, Mayor Lambert. However, there were no charges ever brought against him. There was, I mean, it culminated in nothing. And this sort of supposition on supposition is what I think was properly rejected by the District Court as just being far too speculative. What about, I'm just curious now, what about this charter protection that Appellant talks about? Is that a protection of the position and not an individual? Or is that in the charter, the way you read it? I think the District Court's read of that was correct, and that at best what that establishes is that it entitled the mayor and the other officials to have the assistance of somebody. It didn't guarantee or transform at will employment, and it's just because of the individual who happened to hold that position. Right, but if your defense is that it's a RIF, then the fact that the position was protected does go against you. But were they all protected? How many of these positions did he have? How many of? An administrative? Well, he had plaintiff was serving in that position. Okay. So why isn't that, if he was entitled to have that position, why isn't that relevant? Well, I think, you know, you have to, again, it has to be related to a retaliatory motive. And where you have the evidence that comes forward, which they have not been able to rebut, even assuming, let's say, that gets her past a prima facie case, that there was a requirement by the second round, you know, or by January of 2011, that 5% cuts had to be taken, somebody from each office. Somebody from the mayor's office had not been included in the first round. They couldn't avoid it any further. There is no dispute that she was the lowest person sort of on the totem pole or the least disruptive to the operation of the mayor's office. And so that isn't disputed or rebutted by her. And so where do you come back with further to say, well, no, that's either not true or that is, in fact, a pretext for retaliation? Well, I think that what she's saying is that that is a pretext because the mayor did not have to get rid of this position. The mayor was entitled to keep it. He was entitled to keep it. He wasn't obligated to keep it, particularly under the situation, you know, that was presented by the financial issue. Was it ever filled? No, the record evidence is that it was not, that other members of the department sort of took on some of that role. Do you have any other further questions? Thank you. Thank you. Good morning, Your Honor. Richard Stokin on behalf of appellee Betsy Krampus. I don't want to go over everything either. I think most of everything has been brief. Just touching on that last point, plaintiffs are hanging their hat on that the charter says that the mayor is entitled to a secretary. The position, that's a position. It's not for that specific person. All that, when you read the charter as a whole, it means that they're entitled to have somebody. In this case, the mayor had a chief of staff, had an administrative assistant, which was Julie. My client, Betsy Krampus, was the chief of staff, and then she had a secretary, which Ms. Guzal filled. That's all the charter really reads for. It's not specific to say, so you can get rid of the chief of staff, you can get rid of the other person, but you can't get rid of the secretary. That's not how it's read as a whole. And that's how plaintiff is taking it, and I don't think the court, the district court didn't take it that way, and I think this court shouldn't either. As far as the hearsay statements, plaintiff's appellate brief makes the argument that the district court just ignored them entirely, and the district court didn't. As Judge White pointed out, even if you accepted these hearsay statements from Ms. Williams, the question is, when were they said? Plaintiff's entire case is based on that the city made up this economic crisis, and I think the facts bear it out, as the district court found, in just common sense. The financial crisis 2008-2009 into 2010 is not made up, and the city obviously went through two layers of layoffs. Initially, the mayor's office was not impacted. The second time, it had to be along with some other departments, which previously hadn't been impacted. And as fellow counsel pointed out, they went to the least disruptive position in the mayor's office to lay off, and she wasn't terminated. She was laid off, and when plaintiff mentions the documents saying, well, the documents show that she was terminated, not laid off, there was testimony. But even if she was laid off, that's an adverse decision under the law. So what evidence is there, if any, to show that Mayor Lambert and Ms. Krampitz did not have an ability to influence the decision to lay off Ms. Gazelle? I think the better question is, the answer to your question is, what evidence did plaintiff present that Ms. Krampitz had any influence on this decision-making? As the district court found, there was no proof of that. There allegedly were committees, and there is evidence in the record that there was a committee recommending the layoffs. Did Ms. Krampitz participate on the committee? That is unclear from the record. And you're telling me that the other side should really provide that information. It's their burden. And that, Your Honor, it is unclear from the record, as the district court pointed out. And the district court did plaintiff's job and went through it and said, we don't have to do the job, but we'll scour the record. They scoured the record and couldn't find that answer. Who actually made the decision? Who was on that committee? The only evidence that plaintiff has presented is that there was a meeting, and Julie Witoko came out and told plaintiff that her name was discussed. Well, that's out of context of, well, what was the meeting? What was discussed? Was it discussed? So they didn't present anything to show that. Well, is this atmosphere that Appellant describes as basically a cabal of corruption, I mean, is that whole situation enough to raise an issue as to whether or not, to raise an issue sufficient, rather, to have this case go forward and go to a fact finder? I don't think so. And I think for the reasons the district court found, because when you look at the timing of everything and when you look at the, when she talks about getting handed this pink slip in 2010, she doesn't get laid off for several months later. She doesn't talk to the Michigan State Police until 2012. There's no evidence that the Michigan State Police were even looking at anything in the mayor's office at that time. Now, counsel, he says that you want us to look at this in terms of discrete events. What he's arguing is that this was a continuum of corruption, the influence and interactions and all between the parties, and that you can't go back and engage in the kind of segmentation, I guess, that you're talking about. They're trying to tie everything together, because when you try to break it down in timelines, it doesn't tie into any adverse employment. Because when you talk about in 2010, her job, she wasn't one of the part of the layoffs. So he had to haul that time into the time up until, I believe it was January 2011, when the city made the determination, after many discussions, that there were more layoffs were needed if the millage didn't pass. A bunch of people were handed layoff notices, which everybody agrees were going to be rescinded if the millage passed. So I think when you look at the evidence plaintiff has presented, if she had proof of those claims, had presented evidence of those claims, maybe there would be more weight to it. But there's not. All the allegations that the mayor, the campaign contributions and all that stuff, where's the proof of it? They claim that there were false names signed on campaign contributions. Well, where are those documents? They didn't present any of this. They only presented hearsay and claims from this person to that person. This person said that. Well, how was it hearsay for somebody to say, I was told I had to do this by the mayor or I was threatened with this? The question becomes is what were you threatened with and when and in the context of it. The two statements that he's referencing to Virginia Williams and specifically my client, Betsy Krampus, there hasn't been a context of when those statements were made. You ask that question to plaintiff's counsel, when was the decision made to lay off or when were those claims made? He's not going to know because there's no proof in the record of when it was. Plaintiff couldn't say when it was. Ms. Williams didn't say when it was. Mr. Burcroft, when she allegedly complained to Mr. Burcroft, there's no timeline of when that happened. Was it before? In her deposition, she testified she didn't know when she talked to the mayor, Pro Tem Burcroft. Was it before the layoff notices or was it after? She didn't know. So they want you to look at everything and say the city's a bad, these are bad actors, therefore my case should go forward. But when the district court went through the evidence and when they are presented with their burden of proof, they simply didn't meet that and I would ask the court to affirm. Thank you. Good morning, Your Honor. Excuse me. Good morning, Your Honors. Hillary Ballantyne on behalf of Defendant Appelli, the city of Romulus. I believe at this point it sounds like most of the main points in response to Appellant's argument have been fleshed out by my co-counsel and by the court, so I would use my remaining time by asking the court if it has any more questions on our position that I can answer.  Thank you. Well, for the reasons set forth by my co-counsel, who clearly did the job for me and did it well, we would ask that this court affirm the district court's ruling. Thank you. I believe the question the court had for me was when did this statement take place and it was May of 2010, as indicated by counsel. May 2010, and which statement is that? I'm sorry. That was the date that my client indicated she would not lie and she went and talked to Mr. Bearcarp, it was in May of 2010. And then after that, her name never came up for being laid off, if you would, until after such time as she indicated she would not lie and she told that to Mrs. Krampus, Wotoko, and to Mr. Bearcarp. So her name... What was the date of... It was around May of 2010, I can't give you the exact date, but all this activity took place around May of 2010. So she both made the statement and was laid off that same month. Correct, around about that time. And I can't give the exact date, but I mean, I don't have that in front of me. But at any rate, my client talked about her position in job security and it's, we argued, promissory estoppel and fraud claim. Deborah Hoffman was the finance director and Carol Matic was the human resource director and both of these people informed my client that her job was protected by charter. Her job. Not other people's in the office. Her job was protected by charter. And she was also informed that by Betsy Krampus, one of the defendants, the same thing. Her job, not other people's jobs in the office, was protected by the charter. So, if I could, I believe that... Unless the court has any questions, I'll just have... Any questions at this point? No. I'd ask that this court reverse the child court's decision as to granting defendants all motions for summary disposition as to count one, count three, count four, the hostile work environment, count five, count six, in order that defendant Lambert's motion that was filed approximately five months late for summary disposition be stricken. Discussing order indicated that all motions for summary disposition had to be filed by August 15th. In January, January 10th or so, January 5th, some five months later, defendant Lambert requested and was granted an extension for the discussing order without there being a proper cause or any discussion. We filed objections, but the order was entered and he was allowed to file his motion for summary disposition. Isn't that within the discretion of the trial judge? It is at the discretion, but there's usually a two-step process. One has got to show excusable neglect and there's no harm to the plaintiff. In this particular case, my client would not afford an opportunity to address any of those issues if the order was granted. But if the district court, under its order, allowed the filing and addressed it, what's your basis for asking this court and what would be the authority of this court to strike that filing if, in fact, the district court, who has the prerogative to manage the case, has allowed it to be filed? Well, we weren't even able to file appropriate brief and objections. It was just granted without ever being able to file. Under the local Rule 7-1, usually, not usually, most times, all the time, under Rule 6.14, there has to be a showing of excusable neglect, and that wasn't done either. A good cause and excusable neglect, and none of that was ever demonstrated. So that's what we're arguing. Thank you. Thank you. Thank you all. The case will be submitted. We're going to take a quick break and come back and finish the other two cases. Thank you. The court will take a brief recess, and the proceedings will resume shortly.